**UNITED STATES of America,
Plaintiff,**

v.

**VON'S GROCERY COMPANY and Shopping Bag Food Stores, Defendants.**

**Civ. No. 336–60.**

United States District Court
S. D. California,
Central Division.

Sept. 14, 1964.

James J. Coyle, John F. Hughes, and Malcolm F. Knight, Antitrust Division, Dept. of Justice, Los Angeles, Cal., for plaintiff.

O'Melveny & Myers, by William W. Alsup, William W. Vaughn, Los Angeles, Cal., Johnson, Bates & Sheffield, by James E. Bates, Los Angeles, Cal., for defendants.

CARR, Distict Judge.

■ This is an action instituted by the United States to enjoin the acquisition of Shopping Bag Food Stores by Von's Grocery Company which, it is alleged, violates Section 7 of the Clayton Act (15 U.S.C. § 18). Prior to March 28, 1960, the defendants operated as separate corporations; they are now merged. Jurisdiction exists in this court under Section 15 of the Clayton Act (15 U.S.C. § 25). Plaintiff contends and defendants deny that the effect of the merger between the defendants in this proceeding may be substantially to lessen competition or tend to create a monoply, in violation of Section 7 of the Clayton Act.[1]

The complaint was filed on March 25, 1960, and on March .28, 1960, an application for a temporary restraining order was denied by another judge of this court. Thereafter an application was made by plaintiff for a preliminary injunction to require Von's and Shopping Bag to be operated as separate entities pending trial of the action. This application was also denied by another judge of this court on June 13, 1960, and on July 1, 1960, interlocutory findings of fact and conclusions of law and the interlocutory order denying the motion for preliminary injunction were filed.

On April 24, 1961, a pretrial conference order, signed by the parties, was approved by the court. On December 15, 1961, plaintiff filed a motion for summary judgment which was also denied by another judge of this court.

Beginning in November, 1962, and while discovery proceedings were in progress, efforts were made by the court and counsel to arrive at a method for the presentation of the evidence which would expedite the trial which had been estimated to consume from two to three months. A plan was finally formulated and stipulated to by the parties whereby either side might present, in lieu of oral testimony, affidavits of persons who had been expected to testify. Thereafter the opposing party, if it were desired, could cross-examine such witness by taking a deposition. This procedure was followed with respect to practically all of the witnesses which the parties had anticipated calling at the trial. Both parties called a relatively few witnesses to present oral testimony at the trial. As a result of the pretrial procedures, the case consumed only approximately five days in actual trial time. Also a great many of the facts in the case were either stipulated to or admitted.

In accordance with the pretrial order, as amended, the following facts were admitted and required no proof:

It was agreed that the trial should be confined to the issue of whether the merger violated Section 7 of the Clayton Act and the matter of relief; in the event it was determined that Section 7 had been violated, hearings would thereafter be held as to appropriate relief; Von's was a California corporation with its principal place of business at Los Angeles, California; subsequent to the merger it moved its offices to the former Shopping Bag headquarters at El Monte, California; Von's was one of the leading chains of supermarkets in the Los Angeles area;

1. Clayton Act, § 7, 15 U.S.C.A. § 18 (1963), 38 Stat. 730 (1914): ·
  "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. * * *"

it and its predecessors had been engaged in the purchase, distribution, and retail sale of a complete line of groceries and related products since 1932; in 1959, Von's operated 28 supermarkets in the Los Angeles area with a total annual sales of approximately $85,000,000 for an average of approximately $3,000,000 in sales per store; also its supermarkets are of the self-service, cash and carry type;

Von's also owned and operated a modern distribution center; direct railroad and truck shipments were made to this distribution center which provided facilities to receive and distribute the groceries to Von's supermarkets throughout the Los Angeles area; after the merger Von's sold its distribution center to a competitor and has since used the former Shopping Bag distribution center;

Shopping Bag was a California corporation with principal offices at El Monte, California; on the date of the merger, Shopping Bag was merged into Von's; prior to the merger, Shopping Bag was a leading chain of supermarkets; it and its predecessors had been engaged in the purchase, distribution, and retail sales of a complete line of groceries and related products in the Los Angeles area since 1933; in 1959, Shopping Bag operated 36 complete supermarkets in the area, which had a total annual sales of approximately $79,000,000 for an average of approximately $2,100,000 in sales per store; all of its stores were of the self-service, cash and carry type;

In 1958, Von's ranked third and Shopping Bag fifth in terms of total sales by grocery stores in the Los Angeles metropolitan area; Von's had approximately 4.10% and Shopping Bag approximately 3.09% of all grocery store sales in the area; Shopping Bag ranked sixth and Von's eighth in terms of total number of markets operated in the area in that year; combined, Von's and Shopping Bag ranked second in terms of dollar of sales and in terms of total number of supermarkets in the metropolitan area; following the merger, Von's accounted for approximately 8% of all grocery sales in the area; taken as a whole, the follow-

ing products were agreed to constitute the relevant line of commerce in the case: groceries, meats, produce, bakery goods, dairy produce, delicatessen produce, frozen foods, fruits, vegetables, household supplies, drugs, and sundries; in 1959, the sale of food products accounted for 90% of all sales by grocery stores in the area;

The relevant trade area in which defendants operated prior to the merger was the Los Angeles metropolitan area consisting of Los Angeles and Orange Counties; Los Angeles ranks as the second largest metropolitan area in the United States in terms of population, income, and retail dollar sales; approximately 6,750,000 persons reside in the area and total retail sales were approximately $9,100,000,000 in 1957; the Los Angeles metropolitan area is an appreciable trade area and a section of the country within the meaning of Section 7 of the Clayton Act; sales of groceries in the area approximate $2,500,000,000 annually;

Von's and Shopping Bag prior to the merger were engaged in interstate commerce and Von's presently is engaged in interstate commerce; several cooperatives operate in the metropolitan area, some who sell to nonmembers; Orange Empire, a cooperative, services numerous retail members and nonmembers in California, Arizona, and Nevada with an annual wholesale sales of approximately $280,000,000; prior to the merger, the twenty leading chains of supermarkets were all a part of the retail grocery competition in the area and each of the chains competed with each other; there was direct competition between some of the Von's stores and some of the Shopping Bag stores, particularly in those instances where the stores were so located that they were competing for the same customers.

With respect to the issues of fact and law, the parties are in agreement as follows: (1) that the defendant corporations were engaged in interstate commerce; (2) that the court has jurisdiction; (3) that any products or groups

of products which are of sufficiently peculiar characteristics and uses as to make them distinct from all other products are in line of commerce within the meaning of Section 7 of the Clayton Act and that groceries and related products, taken as a whole, have such peculiar characteristics and uses in the operation of retail grocery stores; (4) that groceries and related products are the relevant line of commerce for determining whether the instant merger violates Section 7; (5) that the area of effective competition is a section of the country in the instant case; (6) that the relevant section of the country need not be the entire nation; (7) that the Los Angeles metropolitan area is a relevant section of the country for determining the effect of the merger.

In view of the stipulations and pretrial orders, it thus appears that the court is called upon to decide only the issue as to whether the merger may be substantially to lessen competition or tend to create a monopoly in the line of commerce and section of the country here involved.

The government apparently in one of its latest memoranda insists, at least inferentially, that the impact upon suppliers is involved as one of the issues in the case. However, it is to be noted that in the pretrial order, as amended, it is stated that defendants assert that the Los Angeles area is not the relevant section of the country as to the wholesale sale and purchase of groceries. There also appears the following:

> "The government assumes no burden of proof as to the relevant section of the country at the wholesale level since *it intends to base its case on the probable effects of the merger in the relevant section of the country for grocery retailers which is the Los Angeles metropolitan area."* (Emphasis supplied.)

Obviously the pretrial order confined the parties to the matters agreed to therein. Furthermore, the government made no attempt to predicate its case upon the basis that suppliers had been eliminated.

■ Both the legislative history [2] and decisions of the Supreme Court, beginning with Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510, set forth the purpose of Section 7 of the Clayton Act. The act was intended to prevent a merger or acquisition of assets when the effect may be to substantially lessen competition or tend to create a monopoly. It was noted in Brown Shoe Co. v. United States, at page 332, United States Reports, 82 S. Ct. at page 1528: "But the very wording of § 7 requires a prognosis of the probable *future* effect of the merger" (italics original). It would appear that in order to determine the future effect resort must be had to the developments in the retail grocery business in the area in question. In making this determination it must be kept in mind that the act intended to cover more than the Sherman Act, yet to stop short of the stated test of Section 7 as it existed at the time the matter was before the Congress for amendment.

The legislative history [2] indicates that the purpose of the proposed amendment to Section 7 was to prohibit the acquisition of the assets of another corporation when the effect of the acquisition may be substantially to lessen competition or tend to create a monopoly. The over-all purpose was to limit further growth of monopoly and aid in preserving small business. On the one hand, it was desired that the test be more inclusive and stricter than that of the Sherman Act; on the other hand, it was not desired that the legislation go to the extreme of prohibiting all acquisition between competing companies. The intent was to cope with monopolistic tendencies in their incipiency and before they had attained such effects as to justify a Sherman Act proceeding. It should be noted that the Senate Report states:

> "These various additions and deletions—some strengthening and others weakening the bill—are not conflicting in purpose and effect. They

---

2. Senate Report No. 1775, 2 U.S.Code Congressional Service, pp. 4293–4300 (81st Congress, 2nd Session, 1950).

merely are different steps toward the same objective, namely, that of framing a bill which, though dropping portions of the so-called Clayton Act test that have no economic significance, reaches far beyond the Sherman Act." (p. 4297)

The words, "may be," appear in the bill in defining the effect on competition. The committee's report states:

"The use of these words means that the bill, if enacted, would not apply to the mere possibility but only to the reasonable probability of the prescribed effect, * * *." (p. 4298)

Before the merger, Von's percentage of sales was 4.7%, while Shopping Bag's was 4.2%. Combined, they represent 8.9% of the sales of the metropolitan area. The following table shows the industry rank and share of the total grocery sales of the 10 leading chains in the area in 1958:

| | 1958 Rank in Sales Before Merger | After | Sales in Los Angeles Metropolitan Area | Percentage |
|---|---|---|---|---|
| Total of Von's and Shopping Bag | – | 1 | $177,867,000 | 8.9 |
| Safeway | 1 | 2 | 161,233,000 | 8.0 |
| Ralph's | 2 | 3 | 128,283,000 | 6.4 |
| Von's | 3 | – | 98,703,000 | 4.7 |
| Market Basket | 4 | 4 | 88,806,000 | 4.4 |
| Thriftimart | 5 | 5 | 88,583,000 | 4.4 |
| Shopping Bag | 6 | – | 84,164,000 | 4.2 |
| Food Giant | 7 | 6 | 72,727,000 | 3.6 |
| Alpha Beta Raisins | 8 | 7 | 62,727,000 | 3.1 |
| Fox Markets | 9 | 8 | 56,438,000 | 2.8 |
| Mayfair | 10 | 9 | 39,360,000 | 2.0 |
| | | | Total | 43.6 |

The change in the number of stores in the area is indicated by the following computations, the word, "multiple," meaning units of two or more stores operated as one concern:

| | Jan. 1, 1950 | Jan. 1, 1961 | Jan. 1, 1963 |
|---|---|---|---|
| Single | 5,365 | 3,818 | 3,590 |
| Multiple | 856 | 923 | 958 |
| | 6,221 | 4,741 | 4,548 |

Between 1948 and 1958 the market share of the 20 largest chains increased from 43.8% to 56.9%. The government contends that the merger had the effect of substantially lessening competition in that separate conduits through which substantial quantities of groceries and related products flowed were united into a single organization; also that the merger united purchasing and warehousing functions, the purchase of advertising as well as all other functions which had formerly been carried on by each of the two corporations.

The government industry witnesses were single store operators and in practically every instance tesified that in their opinion the merger would lessen competition. In most instances, their opinions were of little assistance since at best they were merely conclusions without supporting data or explanation. The defendants presented numerous industry witnesses who testified that the merger would increase competition rather than decrease it. The government did not cross-examine the defense industry witnesses; but the defendants cross-examined the industry witnesses produced by the government. While the government offered some evidence to account for the decrease in the number of single stores, in the main it predicated its position upon the decrease in the number of such stores with the increase in population at the same time.

Many factors appear to account for the decrease in stores and most of those factors are not necessarily connected with the growth of the chains. For example: in 1931, Safeway had approximately 1,000 stores in the area and today it has only 147. The reason for this appears to be the development of the supermarket, the shopping centers, and the decrease of the small neighborhood grocery store. Furthermore, the shift in the population, the shift in transportation from streetcars to automobiles, and many changes in merchandising methods effected the change to the supermarket era. The evidence as to closed chain stores disclosed many reasons for such closings such as failure of some of the local chains, closings to move to what were considered better locations, closings because of the change to the supermarket store, and in some instances the movement of population. Also many of the disappearing single stores became part of chains of two or more stores. One of the important factors in many of the failures was lack of previous experience in the grocery business; however, it was impossible to arrive at the number of failures in this category. It was impossible to determine the number of closings of gro-

cery stores because of the construction of freeways, although the number must have been substantial.

The evidence showed that many persons had entered into the grocery business in recent years often as single store operators and had been successful in increasing their business from year to year. For example: Wood, a grocer, has developed a 10-store chain since 1954, while Grocer Goodnight left a major chain in 1959 and since 1960 has developed a 7-store chain. Defendants produced at least 10 witnesses who had opened single stores in recent years and who have continued to increase their sales year by year. In each instance, they have been competing with the major chains with stores located close to them. One outstanding example was that of Grocer Gelson, who began with assets of $5,000 in 1946 in a small market in North Hollywood. In 1951, he sold this and ultimately ended up in a market in Encino. His annual sales now are approximately $6,-000,000, although he is in competition with stores of the larger chains, the smaller chains, and others.

One thing that stands out in the case is the fact that many executives from chain store operations have left the various chains and opened up stores on their own, usually beginning with a single store and ultimately developing into a small chain of supermarkets. An executive for one of the chains testified that one of the great problems for the larger chains was the loss of executives who were leaving to open grocery businesses of their own. In many instances, these persons have purchased a single store of one of the chains, usually where it was not doing too well, and from that point developed a successful grocery retail business. The experience gained while employed by larger chains has apparently been the basis for the success of many of these operations.

On the other hand, it is to be noted that several of the smaller chains encountered difficulty because of lack of experience, over expansion, and lack of capitalization and were forced into bankruptcy or com-

pelled to sell. The evidence leaves no doubt that experience in the grocery business has usually made it possible for a person to enter the retail grocery field as a single store operator and be successful.

Witness Lebhar, Editor-in-Chief of "Chain Store Age," which publishes "Chain Store Age," "Shopping Center Age," "Discount Store News," and who is also an officer of the Board of Business Guides, Inc., and other publications, testified that the number of concerns operating two or more grocery stores in Los Angeles and Orange Counties increased from 96 in 1953 to 150 in 1962 but that the greatest increase during the period occurred in the number of concerns operating 2 or 3 stores. Such concerns increased 86%—from 56 to 104. His testimony also showed that 7 of the 24 chains which operated 10 or more stores in 1962 were not in business as chains in 1953.

It is interesting to note that in 1948 Safeway accounted for 14.2% of sales in the area and Ralph's, 6.9%, for a total of 21.1%; but in 1958, Safeway and Ralph's combined had declined to 14.3% despite a substantial increase in their sales volume. In other words, during the period when it is claimed that the competitive situation was deteriorating, single store operators and small chains were beginning, growing, and competing successfully.

In 1960, the approximately 4,800 stores in the area were operated by 4,000 separate concerns. During 1960, 128 new "single outlet" stores opened. The leading 20 chains opened 67 new stores in 1960 against 171 by smaller chains and single store operators. While the 10 leading chains accounted for 43.6%, the remainder, including 3,818 single store operators, accounted for 56.4% of the sales in the area in 1960. Another indication of the competitive situation is the fact that Shopping Bag's gross increased while its profits decreased. The witness, Hayden, president of the company, testified that this was occasioned by competition as well as the need for experienced executives.

There was considerable evidence relative to the part played in the grocery business by the so-called cooperatives, namely: the Certified Grocers of California, Ltd., Spartan Cooperative, and Orange Empire. (There is disagreement by the parties as to whether Orange is a cooperative or merely a grocery wholesaler.) Each of these sells only to its members; however, there is apparently no restriction upon those who may become members. The role of the cooperative is of major importance in the distribution of groceries. Certified is wholly owned by the grocery retailers who buy through it. Its membership consists of approximately 900 grocery concerns which operate almost 1,600 retail stores. Spartan Grocers is a wholly owned subsidiary of Certified with approximately 1,200 members who operate 1,255 stores. Most of their members are engaged in business in Los Angeles and Orange Counties. Certified handles more than 13,000 items, including dry groceries, frozen foods, delicatessen products, and various non-food products, including housewares and appliances.

The evidence indicated that some of the larger chains buy their grocery products through Certified. Certified's annual sales increased from $87,000,000 in 1948 to $345,000,000 in 1962.

Orange Empire with approximately 1,000 members accounted for wholesale sales of $321,000,000 in 1962. Certified, Spartan, and Orange do not carry fresh meat or produce or certain dairy products. Generally speaking, the three, Certified, Spartan, and Orange, are made up of a membership of smaller concerns operating from 1 to 20 stores. In so far as the products which are sold by the 3 cooperatives are concerned, there can be little doubt that the single operator or small grocer can compete effectively with the large chains or anyone else in purchasing such groceries.

As to produce which is not distributed by the 3 cooperatives, the evidence indi-

cates that the single store or small operator could effectively compete in purchasing such produce. The government appeared to contend that the large chains had a substantial advantage in the purchase of meat supplies. However, the evidence failed to support this claim.

Another group now participating in the distribution of groceries is the discount house. The evidence indicates that this phase is expanding rapidly and may well indicate a substantially additional competitive force. While the development of the discount house apparently indicates a return to the general store, so, in turn, is the supermarket moving more and more toward the concept of a general store. Many of them now include not only groceries but hardware, appliances, liquor, and many other items which in the past have been distributed by specialty stores.

One of the contentions made by the government is that the chains have a distinct advantage over the smaller concerns in obtaining space in the shopping centers. This is probably true since the average builder of a shopping center is anxious to obtain a longtime lease by a large chain with a well advertised name which will attract attention and also induce other large concerns to lease areas in the shopping center. It is only natural that the shopping center owner would prefer the company with the greater financial resources. Shopping centers are usually in new developments and require some pioneering. The record does not disclose the number of supermarkets in shopping centers or a definition of "shopping centers."

One of the witnesses for defendants, Campbell Stewart, gave testimony which should be accorded considerable weight. He operated retail grocery stores in the area from 1927 to 1945, at which time he became general manager and vice president of Certified. In 1955 he became president, retiring in 1961 although continuing his employment as consultant to Certified. He pointed out that his organization was started by 15 owners of

1 or 2 stores, so that they could pool their purchases and enjoy quantity discounts obtained by the larger concerns. At the time of trial, he testified that Certified is the largest retail-owned food wholesaler in the United States; that Certified is directly concerned by any development in the food retail business which might affect small grocery retailers since they have always been and still are the primary source of Certified's business. He stated that, if the small retailers were placed at a competitive disadvantage, Certified would be adversely affected. He went on to state that in his opinion the merger in question would not tend to substantially lessen competition.

The government's case appears to be predicated upon the following: (1) the union of 2 substantial competitors in the area, (2) increased concentration, (3) a reduction of separate competitive factors, and (4) the elimination of the acquired firm as a separate competitive entity. It will be readily noted that propositions 2, 3, and 4 are necessarily included in proposition 1, that is, the union of 2 substantial competitors. Obviously when 2 substantial competitors merge there has to be increased concentration and a reduction of the separate competitive factors as between the two and the elimination of one as a separate competitive entity. It thus appears that the government in this case is really relying upon a mere union between "2 substantial competitive factors." This, in practical effect, goes back to the Section 7 test which was in effect prior to the amendment of the act in 1950, and was eliminated as was clearly pointed out in the Senate Report. The government argues that over-all competition has been substantially reduced by the merger, but the proof falls short of establishing such to be the case. In fact, the figures relied upon by the government tend to establish to the contrary. Again it is repeated that in 1960 the approximately 4,800 stores in the area were operated by 4,000 separate concerns. The merger here did not materially change that situation. It did not increase or de-

crease competition store for store with any grocer, single store, or chain, since the acquired stores continued as before. As between stores, only a few of Von's and Shopping Bag were in direct competition since generally each company's stores were in different localities of the area. A few did compete directly. Apparently the reason for the failure of the evidence to pinpoint a decrease in competition was because there was actually no decrease.

■■ The parties stipulated to the following, showing the breakdown of concerns in the area in 1962:

| Concerns Operating | No. of Concerns |
|---|---|
| 10 or more stores | 24 |
| 4 to 9 stores | 22 |
| 2 to 3 stores | 104 |
| 1 store | 3,709 |
| Total | 3,859 |

It was also stipulated as follows:

"4. The following table compares the number of stores operated by and the combined market share of the 20 largest chains in the area in 1958 with the smaller chains and independents.*

| | "No. of Stores | Market Share | |
|---|---|---|---|
| | | Govt. Figures | Def. Fig. |
| Top 20 chains | 598 | 56.9% | 54.3% |
| Independents and smaller chains | 4,301 | 43.1 | 45.7" |

*(Reference to footnote omitted.)

———◆———

Here it should be noted that the government seeks to have the court disregard evidence of what occurred after March 20, 1960, the date of the filing of the suit. It is difficult to take such a contention seriously in view of the government's reliance upon facts occurring up to as late as January 1, 1963. For example: Government Exhibit 35 sets forth the number of single and multiple stores as of January 1, 1963, and the government in its proposed findings of fact included these figures. The government's proposed findings of fact also set out figures for both 1961 and 1962 respecting single and multiple stores. Suffice it to say that both *Brown Shoe* and *Dupont* refer to facts occurring after suit was filed and during the pendency of the suit. It would indeed be an incongruity for a court to close its eyes to facts which would, with a reasonable degree of certainty, establish whether or not there was reasonable probability of the lessening of competition and predicate its decision solely upon prediction or prognosis. A court of equity cannot at the time of its decree disregard changed conditions since the filing of the suit or adopt a conclusion that has since proved to be unwarranted.

The evidence respecting the economic conditions existing during the years, 1961, 1962, 1963, would appear to be far more reliable as a guide in determining the effect of the merger than the "prognosis" mentioned in *Brown Shoe*.

One of the principal witnesses for the government supplied evidence which is of material benefit to a determination of this case. He was Ward Jenssen, a market consultant who has worked for a number of chains such as Food Giant, Ralph's, Market Basket, and others. From his research it was developed that customers of supermarkets take various things into consideration including the following: price, general appearance of the store, size and variety of brands, parking space, whether the store is in a shopping center or is a free standing store, general famil-

iarity with the store's reputation, quality of meat, quality of produce, check stand service, cleanliness of the store, etc. The average customer is willing to drive for at least 10 minutes, equivalent to about 4 miles, to shop. Jenssen found that shoppers are willing to pass by other stores in order to go to a specific store which they believed well met their top demands. Research has thus indicated what the shopper wants. The supermarket usually offers most of these things, while the corner grocery cannot. In its "Summary of the Facts" the government states that the decline in the number of individual grocery stores resulted "largely from increasing size of supermarkets * * * and fewer stores are needed to serve a comparable number of people." This appears to account for the decrease in the number of stores and it apparently is what the consumer desires.

The evidence showed that the average shopper has from 2 to 10 competing stores within convenient distance to shop. To increase the number of stores in the area may sound good but to do so may well require a return to the corner grocery and the elimination of the services and quality and variety of products which the public now seems to demand. One thing does appear: Price reduction has gone about as far as possible. The remaining factor is service to the customer and his convenience. An effort to set up an economic environment to equalize competitors in the grocery business will not only destroy the competitive factors which afford the public the benefits which they are now receiving but may well result in much higher prices. The key to success in the grocery business in the area does not appear to rest upon the number of stores operated but how they are operated. From all of the economic factors disclosed, there appears generally to have been a change from the small corner grocery to the supermarket. This would seem to be the main reason for the decrease in the number of stores in the area.

The evidence discloses that the competition in the area appears to remain vigorous, open to anyone and especially those with experience and training, and the consumer is reaping the full benefit. From the evidence, it cannot be concluded that the merger in question would probably lessen competition in the metropolitan area either at the time of the merger or in the foreseeable future. The defendants are entitled to judgment.

Counsel for the defendants is directed to prepare proposed findings of fact and conclusions of law and judgment pursuant to Rule 58, F.R.Civ.P., and to serve and lodge the same with the clerk of the court within 30 days, and plaintiff shall have 15 days thereafter to serve and file objections thereto.