# UNITED STATES *v.* AMERICAN BUILDING MAINTENANCE INDUSTRIES

No. 73–1689.   Argued April 22, 1975—Decided June 24, 1975

*Deputy Assistant Attorney General Wilson* argued the cause for the United States. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Kauper, William L. Patton, Carl D. Lawson,* and *Lee I. Weintraub.*

*Marcus Mattson* argued the cause for appellee. With him on the brief was *Anthonie M. Voogd.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The Government commenced this civil antitrust action in the United States District Court for the Central District of California, contending that the appellee, American Building Maintenance Industries, had violated § 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18, by acquiring the stock of J. E. Benton Management Corp., and by merging Benton Maintenance Co. into one of the appellee's wholly owned subsidiaries. Following discovery proceedings and the submission of memoranda and affidavits by both parties, the District Court granted the appellee's motion for summary judgment, holding that there had been no violation of § 7 of the Clayton Act. The Government brought an appeal to this Court, and we noted probable jurisdiction. 419 U. S. 1104.[1]

## I

The appellee, American Building Maintenance Industries, is one of the largest suppliers of janitorial services in the country, with 56 branches serving more than 500 communities in the United States and Canada. It is also the single largest supplier of janitorial services in southern California (the area comprising Los Angeles, Orange, San Bernardino, Riverside, Santa Barbara, and Ventura Counties), providing approximately 10% of the sales of such services in that area.

---

[1] The Government appealed directly to this Court pursuant to § 2 of the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29. The Government's notice of appeal was filed on February 7, 1974, before the effective date of the recent amendments to the Act. See Antitrust Procedures and Penalties Act, Pub. L. 93–528, § 7, 88 Stat. 1710.

Both of the acquired companies, J. E. Benton Management Corp. and Benton Maintenance Co., also supplied janitorial services in Southern California.[2] Together their sales constituted approximately 7% of the total janitorial sales in that area. Although both Benton companies serviced customers engaged in interstate operations, all of their janitorial and maintenance contracts with those customers were performed entirely within California. Neither of the Benton companies advertised nationally, and their use of interstate communications facilities to conduct business was negligible.[3]

The major expense of providing janitorial services is the cost of the labor necessary to perform the work. The Benton companies recruited the unskilled workers needed to supply janitorial services entirely from the local labor market in Southern California. The incidental equipment and supplies utilized in providing those janitorial services, except in concededly insignificant amounts, were purchased from local distributors.[4]

---

[2] At the time of the acquisition and merger, Jess E. Benton, Jr., owned all the stock of J. E. Benton Management Corp., and 85% of the stock of Benton Maintenance Co. In addition to supplying janitorial services, Benton Management conducted some real estate business and provided building management services entirely within the Southern California area. Benton Maintenance was engaged exclusively in providing janitorial services. The Government has made no claim that the nonjanitorial activities of Benton Management Corp. have any bearing on the issues presented by this case.

[3] The District Court found that the Benton companies made only 10 out-of-state telephone calls related to business activities during the 18-month period prior to the challenged acquisition and merger. The charges for those calls were $19.78. During the same period the Benton companies sent or received only some 200 interstate letters, a number of which were either directed to or received from governmental agencies such as the Internal Revenue Service.

[4] Although many of the janitorial supplies were manufactured outside of California, the District Court found that Benton's direct

It is unquestioned that the appellee, American Building Maintenance Industries, was and is actively engaged in interstate commerce. But on the basis of the above facts the District Court concluded that at the time of the challenged acquisition and merger neither Benton Management Corp. nor Benton Maintenance Co. was "engaged in commerce" within the meaning of § 7 of the Clayton Act. Accordingly, the District Court held that there had been no violation of that law.

The Government's appeal raises two questions: First, does the phrase "engaged in commerce" as used in § 7 of the Clayton Act encompass corporations engaged in intrastate activities that substantially affect interstate commerce? Second, if the language of § 7 requires proof of actual engagement in the flow of interstate commerce, were the Benton companies' activities sufficient to satisfy that standard?

## II

Section 7 of the Clayton Act, 15 U. S. C. § 18, provides in pertinent part:

> "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of .commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

Under the explicit reach of § 7, therefore, not only must the acquiring corporation be "engaged in commerce," but

interstate purchases for the 16-month period prior to the challenged acquisition and merger amounted to a total of less than $140.

the corporation or corporations whose stock or assets are acquired must be "engaged also in commerce." [5]

The distinct "in commerce" language of § 7, the Court observed earlier this Term, "appears to denote only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer. If this is so, the jurisdictional requirements of [§ 7] cannot be satisfied merely by showing that allegedly anticompetitive acquisitions and activities *affect* commerce." *Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U. S. 186, 195. But even more unambiguous support for this construction of the narrow "in commerce" language enacted by Congress in § 7 of the Clayton Act is to be found in an earlier decision of this Court, *FTC* v. *Bunte Bros.,* 312 U. S. 349.

In *Bunte Bros.* the Court was required to determine the scope of § 5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. § 45, which authorized the Commission to proceed only against "unfair methods of competition in commerce." The Court squarely held that the Commission's § 5 jurisdiction was limited to unfair methods of competition occurring in the flow of interstate commerce. The contention that "in commerce" should be read as if it meant "affecting interstate commerce" was emphatically rejected: "The construction of § 5 urged by the Commission would thus give a federal agency pervasive control over myriads of local businesses in matters heretofore traditionally left to local custom or local law. . . . An inroad upon local

---

[5] "Commerce," as defined by § 1 of the Clayton Act, 15 U. S. C. § 12, means "trade or commerce among the several States and with foreign nations . . . ." The phrase "engaged in commerce" is not defined by the Act.

conditions and local standards of such far-reaching import as is involved here, ought to await a clearer mandate from Congress." 312 U. S., at 354–355.[6]

The phrase "in commerce" does not, of course, necessarily have a uniform meaning whenever used by Congress. See, *e. g.*, *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 520–521. But the *Bunte Bros.* construction of § 5 of the Federal Trade Commission Act is particularly relevant to a proper interpretation of the "in commerce" language in § 7 of the Clayton Act since both sections were enacted by the 63d Congress, and both were designed to deal with closely related aspects of the same problem—the protection of free and fair competition in the Nation's marketplaces. See *FTC* v. *Raladam Co.,* 283 U. S. 643, 647–648.

The Government argues, however, that despite its basic identity to § 5 of the Federal Trade Commission Act, the phrase "engaged in commerce" in § 7 of the Clayton Act should be interpreted to mean engaged in any activity that is subject to the constitutional power of Congress over interstate commerce. The legislative history of the Clayton Act, the Government contends, demonstrates that the "in commerce" language of § 7 was intended to be coextensive with the reach of congressional power under the Commerce Clause. Moreover, the argument continues, § 7 was designed to supplement the

---

[6] Congress recently acted to provide such a "clearer mandate," amending the Federal Trade Commission Act by replacing the phrase "in commerce" with "in or affecting commerce" in §§ 5, 6, and 12 of the Act. Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, § 201, 88 Stat. 2193, 15 U. S. C. § 45 (1970 ed., Supp. IV). The amendments were specifically designed to expand the Commission's jurisdiction beyond the limits defined by *Bunte Bros.* and to make it coextensive with the constitutional power of Congress under the Commerce Clause. See H. R. Rep. No. 93–1107, pp. 29–31 (1974).

Sherman Act and to arrest the creation of trusts or monopolies in their incipiency, *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 589, and it would be anomalous, in light of this history and purpose, to hold that the Clayton Act's jurisdictional scope is more restricted than that of the Sherman Act.

It is certainly true that the Court has held that in the Sherman Act, "Congress wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements . . . ." *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, 558. Accordingly, the Sherman Act has been applied to local activities which, although not themselves within the flow of interstate commerce, substantially affect interstate commerce. See, *e. g., Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.,* 334 U. S. 219; *United States* v. *Employing Plasterers Assn.,* 347 U. S. 186. But the Government's argument that § 7 should likewise be read to reach intrastate corporations affecting interstate commerce is not persuasive.

Unlike § 7, with its precise "in commerce" language, § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, prohibits every contract, combination, or conspiracy "in restraint of trade or commerce among the several States . . . ." "The jurisdictional reach of § 1 thus is keyed directly to effects on interstate markets and the interstate flow of goods." *Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U. S., at 194. No similar concern for the impact of intrastate conduct on interstate commerce is evident in § 7's "engaged in commerce" requirements.

The Government's contention that it would be anomalous for Congress to have strengthened the antitrust laws by curing perceived deficiencies in the Sherman Act and at the same time to have limited the jurisdictional scope of those remedial provisions founders also on the express

language of § 7. Thus, although the Sherman Act proscribes *every* contract, combination, or conspiracy in restraint of trade or commerce, whether entered into by a natural person, partnership, corporation, or other form of business organization, § 7 of the Clayton Act is explicitly limited to *corporate* acquisitions. Yet it surely could not be seriously argued that this "anomaly" must be ignored, and § 7 extended to reach an allegedly anticompetitive acquisition of partnership assets.[7] There is no more justification for concluding that the equally explicit "in commerce" limitation on § 7's reach should be disregarded.

More importantly, whether or not Congress in enacting the Clayton Act in 1914 intended to exercise fully its power to regulate commerce, and whatever the understanding of the 63d Congress may have been as to the extent of its Commerce Clause power, the fact is that

---

[7] The Federal Trade Commission has held that such acquisitions may be challenged under § 5 of the Federal Trade Commission Act, which forbids unfair methods of competition on the part of persons and partnerships, as well as corporations. *Beatrice Foods Co.,* 67 F. T. C. 473, 724–727. It is, of course, well established that the Commission has broad power to apply § 5 to reach transactions which violate the standards of the Clayton Act, although technically not subject to the Act's prohibitions. See, *e. g., FTC* v. *Brown Shoe Co.,* 384 U. S. 316, 320–321; cf. *FTC* v. *Sperry & Hutchinson Co.,* 405 U. S. 233. We have no occasion in the case now before us to decide whether application of § 5 to assets acquisitions by or from noncorporate business entities constitutes an appropriate exercise of that power; nor need we consider whether the acquisition of the stock or assets of an intrastate corporation that affected interstate commerce could be challenged by the Commission under the recent jurisdictional amendments to § 5. See n. 6, *supra.* See generally Oppenheim, Guides to Harmonizing Section 5 of the Federal Trade Commission Act with the Sherman and Clayton Acts, 59 Mich. L. Rev. 821; Reeves, Toward a Coherent Antitrust Policy: The Role of Section 5 of the Federal Trade Commission Act in Price Discrimination Regulation, 16 B. C. Ind. & Com. L. Rev. 151, 167–171.

when § 7 was re-enacted in 1950, the phrase "engaged in commerce" had long since become a term of art, indicating a limited assertion of federal jurisdiction. In *Schechter Corp.* v. *United States,* 295 U. S. 495, for example, the Court had drawn a sharp distinction between activities in the flow of interstate commerce and intrastate activities that affect interstate commerce. *Id.,* at 542–544. Similarly, the Court's opinion in *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, two years later, had emphasized that congressional authority to regulate commerce was not limited to activities actually "in commerce," but extended as well to conduct that substantially affected interstate commerce. And the *Bunte Bros.* decision in 1941 had stressed the distinction between unfair methods of competition "in commerce" and those that "affected commerce," in limiting the scope of the Commission's authority under the "in commerce" language of § 5 of the Federal Trade Commission Act.

Congress, as well, in the years prior to 1950 had repeatedly acknowledged its recognition of the distinction between legislation limited to activities "in commerce," and an assertion of its full Commerce Clause power so as to cover all activity substantially affecting interstate commerce. Section 10 (a) of the National Labor Relations Act, 49 Stat. 453, as amended, 29 U. S. C. § 160 (a), for example, empowered the National Labor Relations Board to prevent any person from engaging in an unfair labor practice "affecting commerce." Section 2 (7) of the Act, 49 Stat. 450, as amended, 29 U. S. C. § 152 (7), in turn, defined "affecting commerce" to mean "in commerce, or burdening or obstructing commerce or the free flow of commerce . . . ." Similarly, the Bituminous Coal Act of 1937, c. 127, 50 Stat. 72, providing for the fixing of prices for bituminous coal, the proscription of unfair trade practices, and the establishment of marketing procedures,

applied to sales and transactions "in or directly affecting interstate commerce in bituminous coal." 50 Stat. 76.

In marked contrast to the broad "affecting commerce" jurisdictional language utilized in those statutes, however, Congress retained the narrower "in commerce" formulation when it amended and re-enacted § 7 of the Clayton Act in 1950. The 1950 amendments were designed in large part to "plug the loophole" that existed in § 7 as initially enacted in 1914, by expanding its coverage to include acquisitions of assets, as well as acquisitions of stock. In addition, other language in § 7 was amended to make plain the full reach of the section's prohibitions. See *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 311–323. Yet, despite the sweeping changes made to effectuate those purposes, and despite decisions of this Court, such as *Bunte Bros.,* that had limited the reach of the phrase "in commerce" in similar regulatory legislation, Congress preserved the requirement that both the acquiring and the acquired companies be "engaged in commerce."

This congressional action cannot be disregarded, as the Government would have it, as simply a result of congressional inattention, for Congress was fully aware in enacting the 1950 amendments that both the original and the newly amended versions of § 7 were limited to corporations "engaged in commerce." See, *e. g.,* H. R. Rep. No. 1191, 81st Cong., 1st Sess., 5–6. Rather, the decision to re-enact § 7 with the same "in commerce" limitation can be rationally explained only in terms of a legislative intent, at least in 1950, not to apply the rather drastic prohibitions of § 7 of the Clayton Act to the full range of corporations potentially subject to the commerce power.

Finally, the Government's contention that a limitation of the scope of § 7 to its plain meaning would undermine

the section's remedial purpose is belied by the past enforcement policy of the Federal Trade Commission and the Department of Justice—the two governmental agencies charged with enforcing the section's prohibitions. Clayton Act §§ 11, 15, 15 U. S. C. §§ 21 (a), 25. The Federal Trade Commission has repeatedly held that § 7 applies only to an acquisition in which both the acquired and the acquiring companies are engaged directly in interstate commerce. *E. g., Foremost Dairies, Inc.,* 60 F. T. C. 944, 1068–1069; *Beatrice Foods Co.,* 67 F. T. C. 473, 730–731; *Mississippi River Fuel Corp.,* 75 F. T. C. 813, 918. And while the Government explains that it has never taken a formal position that § 7 does not apply to intrastate firms affecting interstate commerce, it does concede that previous § 7 cases brought by the Department of Justice have invariably involved firms clearly engaged in the flow of interstate commerce.[8] In light of this consistent enforcement practice, it is difficult to credit the argument that § 7's remedial purpose would be frustrated by construing literally § 7's twice-enacted "in commerce" requirement.

[8] Despite this concession, the Government somewhat inconsistently argues that the present case does not in fact involve a substantial departure from the previous § 7 enforcement pattern. In the past, the Government asserts, the United States has challenged acquisitions of "essentially local businesses that affected interstate commerce." *United States* v. *Von's Grocery Co.,* 384 U. S. 270, is cited as an example of such a challenge. But the District Court in that case expressly found that both of the merging grocery chains directly participated in the flow of interstate commerce because each purchased more than 51% of its supplies from outside of California. See 233 F. Supp. 976, 978. And in *United States* v. *County National Bank,* 339 F. Supp. 85, the only other case cited by the Government to support its contention that the case now before us does not involve a departure from previous enforcement policy, the sole question was quite different from that here in issue—whether the "Bennington area" was a "section of the country" within the meaning of § 7 of the Clayton Act.

In sum, neither the legislative history nor the remedial purpose of § 7 of the Clayton Act, as amended and re-enacted in 1950, supports an expansion of the scope of § 7 beyond that defined by its express language. Accordingly, we hold that the phrase "engaged in commerce" as used in § 7 of the Clayton Act means engaged in the flow of interstate commerce, and was not intended to reach all corporations engaged in activities subject to the federal commerce power.

### III

The Government alternatively argues that even if § 7 applies only to corporations engaged in the flow of interstate commerce, the Benton companies' activities at the time of the acquisition and merger placed them in that flow. To support this contention the Government relies primarily on the fact that the Benton companies performed a substantial portion of their janitorial services for enterprises which were themselves clearly engaged in selling products in interstate and international markets and in providing interstate communication facilities.[9] But simply supplying localized services to a corporation engaged in interstate commerce does not satisfy the "in commerce" requirement of § 7.

To be engaged "in commerce" within the meaning of § 7, a corporation must itself be directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce. See *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S., at 195. At the time of the acquisition and merger, however, the Benton companies were completely insulated from any direct participation

---

[9] The Benton companies derived 80% to 90% of their revenues from performance of janitorial service contracts for the Los Angeles facilities of interstate and international corporations such as Mobil Oil Corp., Rockwell International Corp., Teledyne, Inc., and Pacific Telephone & Telegraph Co.

in interstate markets or the interstate flow of goods or services. The firms' activities were limited to providing janitorial services within Southern California to corporations that made wholly independent pricing decisions concerning their own products. Consequently, whether or not their effect on interstate commerce was sufficiently substantial to come within the ambit of the constitutional power of Congress under the Commerce Clause, in providing janitorial services the Benton companies were not themselves "engaged in commerce" within the meaning of § 7. Cf. *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S., at 227–235.[10]

---

[10] The Government notes that this Court has held that maintenance workers servicing buildings in which goods are produced for interstate markets are covered by Fair Labor Standards Act provisions applicable to employees engaged in the production of goods for commerce. See, *e. g., Kirschbaum Co.* v. *Walling*, 316 U. S. 517; *Martino* v. *Michigan Window Cleaning Co.*, 327 U. S. 173. In *Kirschbaum* the Court reasoned: "Without light and heat and power the tenants could not engage, as they do, in the production of goods for interstate commerce. The maintenance of a safe, habitable building is indispensable to that activity." 316 U. S., at 524. Similarly, the Government argues, in the present case the Benton janitorial services were so essential to the interstate operations of their customers that they, too, should be considered part of the flow of commerce.

The Fair Labor Standards Act, however, is not confined, as is § 7 of the Clayton Act, to activities that are actually "in commerce." At the time of the decisions relied upon by the Government, the Act provided that "an employee shall be deemed to have been engaged in the production of goods [for interstate commerce] if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, *or in any process or occupation necessary to the production thereof* . . . ." Fair Labor Standards Act of 1938, § 3 (j), 52 Stat. 1061, as amended, 29 U. S. C. § 203 (j) (1946 ed.) (emphasis added). Congress thus expressly intended to reach not only those employees who directly participated in the production of goods for interstate markets, but

Similarly, although the Benton companies used janitorial equipment and supplies manufactured in large part outside of California, they did not purchase them directly from suppliers located in other States. Cf. *Foremost Dairies, Inc.*, 60 F. T. C., at 1068–1069. Rather, those products were purchased in intrastate transactions from local distributors. Once again, therefore, the Benton companies were separated from direct participation in interstate commerce by the pricing and other marketing decisions of independent intermediaries. By the time the Benton companies purchased their janitorial supplies, the flow of commerce had ceased. See *Schechter Corp.* v. *United States*, 295 U. S., at 542–543.[11]

In short, since the Benton companies did not participate directly in the sale, purchase, or distribution of goods or services in interstate commerce, they were not "engaged in commerce" within the meaning of § 7 of the Clayton Act.[12] The District Court, therefore, properly

---

also those employees outside the flow of commerce but nonetheless necessary to it. Although Congress in 1950 could constitutionally have extended § 7 of the Clayton Act to reach comparable activity, it chose not to do so. See *supra*, at 279–281.

[11] The Government does not suggest that the purchase of janitorial equipment and supplies from local distributors placed the Benton companies in the flow of commerce, although it does argue that because of those purchases the firms had a substantial effect on interstate commerce—an issue not relevant in light of our construction of the reach of § 7 of the Clayton Act.

[12] The Government contends that the sale of janitorial services "necessarily" involves interstate communications, solicitations, and negotiations, and that such interstate activity should be viewed as part of the flow of interstate commerce. The merits of that argument need not be considered, however, since the record before the District Court does not support a finding that any of the Benton janitorial service contracts were obtained through interstate solicitation or negotiation.

concluded that the acquisition and merger in this case were not within the coverage of § 7 of the Clayton Act. The judgment of the District Court is affirmed.

*It is so ordered.*

MR. JUSTICE WHITE, concurring.

I concur in the judgment and in Parts I and II of the Court's opinion. I do not join Part III, for I doubt that the interposition of a California wholesaler or distributor between the Benton companies and out-of-state manufacturers of janitorial supplies necessarily requires that the Benton companies be found not to be "in commerce" merely because they buy *directly* from out-of-state suppliers only a negligible amount of their supplies. For the purposes of § 7 of the Clayton Act, a remedial statute, the regular movement of goods from out-of-state manufacturer to local wholesaler and then to retailer or institutional consumer is at least arguably sufficient to place the latter in the stream of commerce, particularly where it appears that when the complaint was filed, cf. *United States* v. *Penn-Olin Co.*, 378 U. S. 158, 168 (1964), the "local" distributor from which supplies were being purchased was a wholly owned subsidiary of the acquiring company, a national concern admittedly in commerce. In this case, however, the United States makes no such contention and appellee's motion for summary judgment was not opposed by the Government on that theory. It is therefore inappropriate to address the issue at this time; and on this record, I concur in the judgment that the Benton companies were not in commerce.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN joins, dissenting.

For the reasons set forth in my dissenting opinion in *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S. 186, 204–

207 (1974), decided earlier this Term, I cannot agree that the "in commerce" language of § 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18, was intended to give that statute a narrower jurisdictional reach than the "affecting commerce" standard which we have read into the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1 *et seq.* On the record in this case, it is beyond question that the activities of the acquired firms have a substantial effect on interstate commerce. I would therefore reverse the summary judgment granted below and remand for further proceedings in the District Court.

MR. JUSTICE BLACKMUN, dissenting.

I believe that the scope of the Clayton Act should be held to extend to acquisitions and sales having a substantial effect on interstate commerce. I therefore dissent. For me, the reach of § 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18, is as broad as that of the Sherman Act, and should not be given the narrow construction we properly have given, just this Term, to the Robinson-Patman Act. *Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U. S. 186 (1974).

For more than a quarter of a century the Court has held that the Sherman Act should be construed broadly to reach the full extent of the commerce power, and to proscribe those restraints that substantially affect interstate commerce. See, *e. g., Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.,* 334 U. S. 219, 234 (1948); *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, 558 (1944). The Clayton Act was enacted to supplement the Sherman Act, and to "arrest in its incipiency" any restraint or substantial lessening of competition. *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 589 (1957). To ascribe

to Congress the intent to exercise less than its full commerce power in the Clayton Act, which has as its purpose the supplementation of the protections afforded by the Sherman Act, is both highly anomalous and, it seems to me, unwarranted. Section 7 should not be limited, as the Court limits it today, to corporations engaged in interstate commerce, but should be held to include those intrastate activities substantially affecting interstate commerce.