**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jerry Dale LOWE, Defendant–Appellant.**

**No. 94–5713.**

United States Court of Appeals,
Fourth Circuit.

Argued July 13, 1995.

Decided Sept. 20, 1995.

**ARGUED:** Rebecca Ann Baitty, Lutz, Webb, Partridge, Bobo & Baitty, P.A., Sarasota, FL, for appellant. John Castle Parr, Assistant United States Attorney, Charleston, WV, for appellee. **ON BRIEF:** Charles T. Miller, Acting United States Attorney, Michael L. Keller, Assistant United States Attorney, Charleston, WV, for appellee.

Before NIEMEYER, HAMILTON, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge HAMILTON wrote the opinion, in which Judge NIEMEYER joined. Judge MOTZ wrote a dissenting opinion.

## OPINION

HAMILTON, Circuit Judge:

Appellant, Jerry Dale Lowe (Lowe), appeals his conviction and sentence for three violations of 18 U.S.C. § 33 and one violation of 18 U.S.C. § 924(c)(1). For reasons that follow, we affirm.

### I

The events giving rise to Lowe's criminal prosecution occurred on July 22, 1993, at a picket line during a national strike by the United Mine Workers of America (UMWA). As part of the strike, which began on May 18, 1993, Local 5958 of the UMWA began a work stoppage at a surface mine in Logan County, West Virginia. The mine, known as the Ruffner Mine, was operated and owned by Apogee Coal Company, d/b/a "Arch of West Virginia" (Arch). The coal mined from the Ruffner Mine was distributed to various states in the United States.

Arch regularly employed Blackhawk Security and Investigators to provide security services when the mine was not on strike. However, after being selected by the UMWA as one of the targets of the national strike, Arch contracted with Elite Security Company (Elite), a North Carolina corporation. Elite assumed the responsibility of providing security services for safeguarding personnel, supplies, and equipment of Arch and its subcontractors.

The picket line at issue was not at the entrance to the Ruffner Mine, but rather on a road, Slab Fork Hollow Road, which leads to the entrance of the Orion Mine, a mine not selected as a target by the UMWA. The picket line on Slab Fork Hollow Road was established, among other reasons, because the Orion Mine, which was not a target of the UMWA, continued to mine coal for Arch during the strike.

Slab Fork Hollow Road runs from Rum Creek Road into a hollow where it eventually leads to the entrance to Orion Mine and a sediment pond used by Arch.[1] The picket line was located on Slab Fork Hollow Road a short distance from the point where Slab Fork Hollow Road and Rum Creek Road intersect. The picket line was also close to an access road which ran perpendicular to Slab Fork Road; the access road was on the left when travelling away from Rum Creek Road toward the Orion Mine and the sediment pond.[2]

Prior to the strike, Arch contracted with Deskins Contracting (Deskins) to provide environmental services to the sediment pond on Slab Fork Hollow Road utilized by the Ruffner Mine.[3] After receiving a citation for a violation of the environmental laws, which could have led to the closing of the Ruffner

---

1. The sediment pond on Slab Fork Hollow Road utilized by Arch and the Orion Mine were accessible only from Slab Fork Hollow Road.

2. The side of Slab Fork Hollow Road on which the entrance to the access road is located was referred to at trial as the "creek side" of Slab

Fork Hollow Road; a creek runs along that side of Slab Fork Hollow Road.

3. Deskins, a West Virginia based business, provided mine contracting services, including environmental services, in both West Virginia and Kentucky.

Mine, Arch contracted with Deskins to clean the sediment pond.

On July 22, 1993, heavy equipment was taken to the sediment pond to perform the legally-mandated environmental corrections. Two Deskins employees, Marion Hensley (Hensley) and John Edward York (York), were assigned to travel to the sediment pond in separate company trucks owned by Deskins and to remove sludge from the sediment pond. Hensley arrived at the sediment pond on the morning of July 22, 1993, and was later joined by York between 12:30 p.m. and 1:00 p.m.

Various union pickets appeared at the picket line pursuant to their shift obligations. Although Lowe was not scheduled to work the picket line on July 22, 1993, he arrived at the picket line sometime between noon and 1:00 P.M. When Lowe learned that the Deskins' equipment had passed the picket line travelling to the sediment pond, he left the area, and returned to his home, which was located nearby. Once at his home, Lowe telephoned the president of Local 5958, Ernest Lee Woods (Woods). Lowe left a message for Woods regarding the heavy equipment's arrival at the sediment pond and insisted that he come to the picket line. Lowe then returned to the picket line. While Lowe was at the picket line that day, he drank Budweiser Light beer[4] and stopped the second-shift Orion miners from reporting to work.[5]

At approximately 5:00 p.m., a Ford Bronco driven by Larry Kopplin of Elite and a Chevrolet Club Cab driven by another employee of Elite, left the guard shack at the entrance of the Ruffner Mine to provide an escort through the picket line for Hensley and York.[6] As the two-car convoy travelled up Slab Fork Hollow Road and passed the picket line, the Ford Bronco was hit by a steel ball shot from a wrist rocket launched by one of the pickets. The ball hit the Ford Bronco below the glass on the passenger side. As the security vehicles were proceeding up

Slab Fork Hollow Road toward the sediment pond, the pickets heard a loud noise, which some pickets believed to be a backfire. Others believed the noise was a firecracker, and still others thought it was a gun shot resulting from one of the security guards firing into the air.

Woods was one of the pickets who believed that the security guards had fired a shot to intimidate the pickets. Angered by this action, Woods, along with other pickets gathered to discuss an appropriate response. At this meeting, the pickets decided to ambush the vehicles when they returned.

Collectively, the pickets began taking positions for the attack, masking themselves and gathering rocks as they waited for the trucks to return. Most of the pickets took positions on the access road. Two pickets, Luther Shell and Larry Perry, took positions on the side of Slab Fork Hollow Road opposite the creek. Lowe positioned himself in a wooded-area along the creek side of Slab Fork Hollow Road; this area was in a direction away from the access road toward the Orion Mine and the sediment pond utilized by Arch.

At approximately 5:30 p.m., the convoy of four vehicles, lead by Kopplin in the Ford Bronco, started down Slab Fork Hollow Road, followed by York's pick-up truck, the truck driven by Hensley, and finally the Chevrolet Club Cab driven by another employee of Elite. Before they reached the area where the pickets gathered, Hensley and York stopped their vehicles to have a discussion. According to Hensley, York stated that he was afraid to go ahead of Hensley and asked Hensley to go in front of him. Hensley and York then switched the positions of their trucks, with Hensley going in front of York.

As the vehicle driven by Kopplin approached the area where the pickets were waiting, his Ford Bronco was pelted by rocks, smashing the windshield. Hensley's

---

4. Lowe brought the Budweiser Light beer to the picket line in his truck. UMWA regulations prohibit the consumption of alcohol at picket lines.

5. Woods later instructed the pickets to allow the second-shift Orion miners to report to work.

6. The entrance to the Ruffner Mine is three to four miles from the intersection of Slab Fork Hollow Road and Rum Creek Road.

vehicle suffered the same attack, with his windshield being broken. When York saw the rock attack, he initially slowed down and then sped up. As York was approaching the rock throwers, a bullet, fired from the creek side of Slab Fork Hollow Road from the area Lowe had positioned himself, entered the rear window of his pick-up truck, striking York in the head and killing him instantly. York's vehicle came to rest on the side of Slab Fork Hollow Road opposite the creek. The Chevrolet Club Cab's back passenger window was also struck by a bullet from the same area on the creek side of Slab Fork Hollow Road.

When Kopplin attempted to aid York, the pickets continued to throw rocks until Woods realized that York was seriously injured and told them to stop. At that time, the pickets complied. The pickets then began running in a direction away from the vehicle in which York lay dead.

Following the report of the shooting, the West Virginia State Police appeared at the scene with Corporal Bob Johnson (Johnson) taking the lead in the investigation. Statements were taken that night from a number of the miners who were present at the picket line. In his statement, Lowe admitted to participating in the rock attack, but specifically denied that he had been drinking.

The continuing investigation in the case revealed that the bullet that entered the back of York's head had a "left-hand twist," which immediately suggested to the officers that they were looking for a Colt-manufactured pistol. A Colt Trooper Mark III pistol was known to be a pistol that could produce a "left-hand twist" marking on a bullet. It was later learned that Lowe, on a day previous to the day York was killed, possessed a Colt Trooper Mark III pistol at the picket site, having transported it to the picket site in his truck. On two occasions during the investigation, Johnson and FBI Agent Brad Hoffert asked Lowe if he had ever owned, traded, or possessed a Colt Trooper pistol. On each occasion, Lowe denied owning, possessing, or trading such a pistol.

The investigators later learned that William Lowe, Lowe's nephew, had brought a stolen .357 Colt Trooper Mark III pistol to West Virginia from Marseilles, Illinois, on July 10, 1993, showed the weapon to Lowe on or about July 12, 1993, and gave it to him approximately two days later. Approximately three months after the ambush, the government recovered the Colt Trooper Mark III pistol possessed by Lowe and William Lowe when it was turned over to the government by the attorney for Lawton Jack Starkey (Starkey).[7] At trial, Lowe testified that he sold the weapon to Starkey "[a] week to two weeks" prior to the ambush. (J.A. 785).

On November 2, 1993, a grand jury sitting in the Southern District of West Virginia returned a four-count indictment against Lowe and seven others. Count one charged Lowe and seven others with conspiring to willfully, with reckless disregard for the safety of human life, attempt to damage and disable a motor vehicle which was being used in interstate commerce, and likewise to incapacitate the driver of the vehicle, see 18 U.S.C. §§ 33 and 371. Count two of the indictment alleged that Lowe, aided and abetted by others, with reckless disregard for the safety of human life, willfully damaged, disabled, and attempted to damage and disable motor vehicles which were being used in interstate commerce, see 18 U.S.C. §§ 33 and 2. Count three charged Lowe with an additional violation of 18 U.S.C. § 33 for shooting York, and count four charged Lowe with using a firearm during a crime of violence, see 18 U.S.C. § 924(c)(1).

On June 13, 1994, the case proceeded to trial. At trial, the government introduced evidence as to the positioning of each of the pickets participating in the ambush. The government also introduced evidence that, just prior to the ambush, Lowe possessed a BB-gun, but complained that the BB-gun was "worthless" and that he "would be better off to throw a rock." (J.A. 340). After making this statement, Lowe took the BB-gun back to his truck, the same truck in which he had been seen carrying the Colt Trooper Mark III pistol. The government also introduced the expert testimony of John O'Neil (O'Neil),

---

7. Starkey was one of the pickets who participated in the ambush.

a senior firearms and toolmark examiner for the Bureau of Alcohol, Tobacco, and Firearms. O'Neil, who testified as an expert in the determination of ballistics, firearms identification, and crime scene shot reconstruction, testified that the Colt Trooper Mark III pistol was the weapon that fired the shot which killed York. O'Neil further testified, in relation to shot reconstruction, that based on information normally relied upon by authorities in his field of expertise, he was able to determine a conical area from which the fatal shot would have had to originate. Only Lowe was known to have been within the area reflected by this cone. At the site, and within the possible firing area indicated by O'Neil, was a banked area approximately four to six feet off Slab Fork Hollow Road. In that area, a Budweiser Light beer can was recovered.

On June 24, 1994, the jury returned verdicts of guilty on all four counts of the indictment. The district court sentenced Lowe to 130 months' imprisonment. Lowe was also ordered to pay restitution in the amount of $6,318.50 as reimbursement to York's family for funeral expenses.[8]

Lowe appeals.

## II

We will first address Lowe's challenges to the sufficiency of the evidence.

## A

■ In reviewing the sufficiency of the evidence to support Lowe's convictions, this court must view the circumstantial and direct evidence in the light most favorable to the government and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Giunta*, 925 F.2d 758, 764 (4th Cir.1991). Credibility determinations are within the sole province of the jury and are not susceptible to judicial

review. *See United States v. Saunders*, 886 F.2d 56, 60 (4th Cir.1989).

## B

Lowe argues that the government did not offer sufficient proof at trial that his conduct fell within two definitional provisions of 18 U.S.C. § 33. To address these arguments, we must turn to the pertinent language of § 33:

> Whoever willfully, with intent to endanger the safety of any person on board or anyone who he believes will board the same, or with a reckless disregard for the safety of human life, damages, disables, destroys, tampers with, or places or causes to be placed any explosive or other destructive substance in, upon, or in proximity to, any motor vehicle which is used, operated, or employed in interstate or foreign commerce, or its cargo or material used or intended to be used in connection with its operation; or ...
>
> Whoever with like intent, willfully disables or incapacitates any driver or person employed in connection with the operation or maintenance of the motor vehicle, or in any way lessens the ability of such person to perform his duties as such; or
>
> Whoever willfully attempts to do any of the aforementioned acts—shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

The accompanying definitional provision, 18 U.S.C. § 31, defines "motor vehicle" as a:

> carriage or other contrivance propelled or drawn by mechanical power and used for commercial purposes on the highways in the transportation of passengers, passengers and property, or property or cargo[.]

Section 31 also defines "used for commercial purposes" as the:

> carriage of persons or property for any fare, fee, rate, charge, or other consideration, or directly or indirectly in connection with any business, or other undertaking intended for profit.

8. Lowe's seven codefendants entered into plea agreements with the government wherein they agreed to plead guilty to destruction of property in state court. Each codefendant was sentenced to 120 days' imprisonment and fined $500.

## 1

■ Lowe contends that the vehicles involved in this case did not meet the definition of "motor vehicle" as defined in 18 U.S.C. § 31. We disagree. Clearly, all of the vehicles in the convoy were: (1) a "carriage or other contrivance propelled or drawn by mechanical power"; (2) used "directly ... in connection with a[ ] business"; and (3) used on the highways. Furthermore, each of the vehicles was used "in the transportation of passengers." The Elite vehicles were used to escort the Deskins employees from the waste area to a safe point outside the mine, and the vehicles used by Deskins were used to transport workers for Deskins from the waste area to a safe point outside the mine. Thus, the vehicles in the convoy were "motor vehicles" within the meaning of the statute.

## 2

■ Lowe's next contention is that the government did not offer sufficient proof at trial that the vehicles at issue were used in interstate commerce within the meaning of § 33. Again, we disagree. The vehicles at issue here were clearly used in interstate commerce. Arch was engaged in the distribution of coal in the interstate market and Arch employed two companies, Elite and Deskins, each of which regularly sold security or environmental services in the interstate market. The vehicles in the convoy were used to further the distribution of Arch's coal to interstate markets; indeed, without the assistance of Elite and Deskins, it is likely the Arch mine would have had to cease its operations permanently. Furthermore, the vehicles were used in furtherance of Elite's business of furnishing security services in the interstate market. In short, we have no difficulty concluding the vehicles in the convoy were used in interstate commerce at the time of the attack.

## C

■ Lowe also contends that the government offered insufficient proof at trial that he fired the shot that killed York. We disagree. In this case, the jury had ample circumstantial evidence from which it could rationally conclude that Lowe fired the fatal shot from the Colt Trooper Mark III pistol which ended the life of York. First, as testified to by O'Neil, it was uncontroverted at trial that the Colt Trooper Mark III pistol fired the fatal shot that killed York. Second, Lowe, within days prior to the shooting, possessed the Colt Trooper Mark III pistol at the picket site. Third, shortly before the attack, Lowe was seen in possession of a BB-gun, but complained it was worthless for an attack on the vehicles; Lowe then took the BB-gun back to his truck—the same truck in which he had been seen carrying the Colt Trooper Mark III pistol. Fourth, there is evidence in the record from which the jury could find that Lowe fired the fatal shot. In this regard, O'Neil's testimony established a cone-shaped area from which the fatal shot originated and the circumstantial evidence, namely, the evidence that the shot came from the creek side of the road in the area Lowe positioned himself for the ambush and the discovery of the Budweiser Light beer can within the conical area described by O'Neil, placed Lowe in the area described by O'Neil. In light of this evidence, a rational jury could determine, beyond a reasonable doubt, that Lowe possessed the Colt Trooper Mark III pistol and fired the fatal shot that killed York.

## III

Lowe also attacks two evidentiary rulings made by the district court.

## A

Lowe argues that the district court committed reversible error when it refused to admit his statement (made several days prior to the shooting) to William Lowe that he had sold the Colt Trooper Mark III pistol and could not get it back. At trial, Lowe sought to introduce this statement during the cross-examination of William Lowe, and later during his own direct examination. On the former occasion, Lowe claimed his statement was not hearsay because the statement was not offered for the truth of the matter asserted, *see* Fed.R.Evid. 801(c), and, even if it was, the statement was *res gestae*. On the latter occasion, Lowe contended that his

statement to William Lowe was admissible as a statement against interest under Rule 804(b)(3). After both attempts to admit this statement, the district court sustained the government's objection.

■ On appeal, Lowe argues that his statement to William Lowe should have been admitted as a prior consistent statement to rebut an express or implied charge of recent fabrication under Rule 801(d)(1)(B). Having failed to argue at trial that his statement to William Lowe was admissible under Rule 801(d)(1)(B), we review for plain error under Fed.R.Crim.P. 52(b). *See Hudspeth v. Commissioner*, 914 F.2d 1207, 1215 (9th Cir.1990) (Under Rule 103(a) and (d), "[w]hen the trial court excludes evidence, failure to make a timely invocation of the grounds for the admission of the evidence renders the issue reviewable only for plain error."); *see also United States v. Pugliese*, 712 F.2d 1574, 1580–81 (2d Cir.1983) (On appeal, defendant precluded from asserting grounds for admissibility that were not raised at trial); *United States v. Sims*, 617 F.2d 1371, 1375–78 (9th Cir.1980) (court applied plain error standard to defendant's argument on appeal that FBI report was not hearsay or was admissible under the public records exception, Rule 803(8), where the defendant, after the government objected to the report's admission, contended that the report was admissible as a business record under Rule 803(6)).

■ Under Fed.R.Crim.P. 52(b), our review is limited to correcting errors which meet four requirements. *See United States v. Olano*, ⸺ U.S. ⸺, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Under *Olano*, we may correct: (1) error; (2) that is plain; (3) that affects substantial rights; and (4) that " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Id.* at ⸺⸺, 113 S.Ct. at 1776–79.

■ We believe the district court did not commit error, let alone plain error, in refusing to admit Lowe's statement. Rule 801(d)(1) provides that a statement is not hearsay if:

The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the state-

ment is ... (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

Under this rule, "[c]orroborative testimony consisting of prior, consistent statements is ordinarily inadmissible unless the testimony sought to be bolstered has first been impeached." *See United States v. Weil*, 561 F.2d 1109, 1111 (4th Cir.1977); *see also United States v. Leggett*, 312 F.2d 566, 572 (4th Cir.1962) ("The decisions following the established rule are in agreement in holding that proof of prior consistent statements is not admissible unless and until there has been some impeachment of the witness."). Because Lowe attempted to introduce his prior statement before his testimony was impeached by the government, his statement to William Lowe was not admissible under Rule 801(d)(1)(B) during the cross-examination of William Lowe, and later during his own direct examination.

During the presentation of Lowe's defense, he called William Lowe to testify. Lowe argues that, during William Lowe's direct examination, the district court erred in refusing to admit Lowe's statement to William Lowe pursuant to Rule 801(d)(1)(B). The record, however, reflects that the district court did not exclude the statement at this time. The following exchange occurred during the direct examination of William Lowe:

Q. After you gave him the gun, did there come a time that you went to you uncle to try to get the gun back?

A. Yes.

Q. Was that before or after July 22nd?

A. Before.

Q. Were you able to get the gun back from Mr. Lowe?

MR. PARR: Objection, Your Honor. This is what we dealt with at the bench.

THE COURT: The witness has already answered that question earlier in the trial, and if it's objectionable, it's simply because it's already been covered, but I suppose there is no harm in answering it again. Put the question again and let's see what the witness' answer is.

Q. Were you able to get the gun back, Mr. Lowe?

A. No, I wasn't.

(J.A. 812–13). Because Lowe never sought to introduce his statement to William Lowe during William Lowe's direct examination, the district court could not have committed reversible error in refusing to admit it at that time.

B

The second statement Lowe attempted to introduce concerned a proffer given by the attorney for Lawton Jack Starkey regarding Starkey's purchase of the Colt Trooper Mark III pistol. The proffer from Starkey's counsel indicated that Starkey had purchased the Colt Trooper Mark III pistol from Lowe prior to July 22, 1993, and that following his purchase, he took the pistol to his farm in Pocahontas County, West Virginia, where it remained until he made arrangements with his counsel to provide the weapon to the government nearly three months after the attack. The proffer specifically included the representation that when Starkey received the pistol from Lowe, he did not know it was stolen. The proffer likewise denied any involvement by Starkey in the shooting of York.

At trial, Lowe contended that counsel for Starkey should be required to testify and that the proffer should be admitted as a statement against interest under Rule 804(b)(3). The district court ruled that the statement was clearly hearsay and not admissible as a statement against interest.

■ Rule 804(b)(3) provides:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless

corroborating circumstances clearly indicate the trustworthiness of the statement. A statement may be admitted under this rule if the declarant is unavailable; the statement is genuinely adverse to the declarant's penal interest; and "corroborating circumstances clearly indicate the trustworthiness of the statement." "The party offering the statement bears the 'formidable burden' of meeting the requirements of Rule 804(b)(3), and the court's decision on its admissibility is reviewed for abuse of discretion." *United States v. Bumpass*, 60 F.3d 1099, 1102 (4th Cir.1995) (quoting *United States v. Mac-Donald*, 688 F.2d 224, 233 (4th Cir.1982), *cert. denied*, 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983)).

■ Having asserted his Fifth Amendment privilege against self-incrimination, Starkey was unavailable to Lowe. *See* Fed. R.Evid. 804(a)(1). The question of whether Starkey's statement to his counsel was adverse to his penal interests is a much closer question, and a question we need not decide because the district court did not abuse its discretion when it found the lack of sufficient "corroborating circumstances."

In *Bumpass*, we quoted from our decision in *United States v. Brainard*, 690 F.2d 1117 (4th Cir.1982), to explain the nature and purpose of corroborating circumstances under Rule 804(b)(3):

The requirement of corroborating circumstances was designed to protect against the possibility that a statement would be fabricated to exculpate the accused. Thus, the Advisory Committee explained the requirement of corroborating circumstances as follows:

[O]ne senses in the decisions a distrust of evidence of confessions by third persons offered to exculpate the accused arising from suspicions of fabrication either of the fact of the making of the confession or in its contents, enhanced in either instance by the required unavailability of the declarant.

F.R.Evid. 804(b)(3), Advisory Committee Notes. The rule requires not a determination that the declarant is credible, but a finding that the circumstances clearly indicate that the statement was not fabricated.

It is the statement rather than the declarant which must be trustworthy.

*Bumpass,* 60 F.3d at 1102 (quoting *Brainard,* 690 F.2d at 1124). The requirement of corroborating circumstances "need not 'remove all doubt with respect to the hearsay statement,'" *Id.* (quoting *Brainard,* 690 F.2d at 1125 n.14), but rather the requirement only mandates "corroborating circumstances 'clearly indicate the trustworthiness of the statement.'" *Id.* In *Bumpass,* we added these words of caution:

> But it must be remembered that admission of such hearsay leaves the party against whom it is offered without the important benefit of cross examination. The level of corroboration therefore must be sufficient that cross examination would add little to test the hearsay's reliability.

*Id.*

To assess the corroborating circumstances of a given statement, we look to:

> (1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement, (2) the declarant's motive in making the statement and whether there was a reason for the declarant to lie, (3) whether the declarant repeated the statement and did so consistently, (4) the party or parties to whom the statement was made, (5) the relationship of the declarant with the accused, and (6) the nature and strength of independent evidence relevant to the conduct in question.

*Id.*

Working from the premise that Lowe has a "formidable burden" in establishing corroborating circumstances, we cannot conclude that the district court abused its discretion in refusing to admit Starkey's statement through his attorney. First, there was no evidence offered to corroborate the portion of Starkey's statement that, following the alleged purchase, the Colt Trooper Mark III pistol was taken out to Starkey's farm and remained there until Starkey relinquished control over it several months later. Second, although Starkey was arguably exposed to prosecution in light of his statement, Starkey

and Lowe were union brethren, and Starkey had a clear motive to lie in this case: the government, through its theory of the shooting, could not place Starkey in the area in which the fatal shot originated.[9] Third, Starkey's statement contradicts a crucial uncontroverted fact in the case: the Colt Trooper Mark III pistol fired the fatal shot that killed York. When assessing the corroborating circumstances of a statement, a court can make an assessment of the evidence. *Id.* at 1103 ("Even though the assessment of such evidence is the responsibility of the jury in determining the defendant's guilt, such evidence may also be considered by the court when ruling on the trustworthiness of hearsay, an evidentiary question which is committed to the court for decision."). Fourth, cross-examination of Starkey would have undoubtedly tested the reliability of Starkey's statement to his attorney. *Id.* at 1102. In summary, we cannot conclude the district court abused its discretion in excluding Starkey's statement which was offered through his counsel.

## IV

 On three fronts, Lowe challenges the district court's jury instructions. We review the district court's jury instructions "in their entirety and as part of the whole trial." *United States v. Bostian,* 59 F.3d 474, 480 (4th Cir.1995). Our focus is on "'whether the court adequately instructed the jury on the elements of the offense and the accused's defenses.'" *Id.* (quoting *United States v. Fowler,* 932 F.2d 306, 317 (4th Cir.1991)).

The relevant part of the instructions challenged by Lowe provides:

> I want to define a motor vehicle for you. Under Section 33, the definition of motor vehicle includes contrivances such as trucks which are used for commercial purposes on the highways in the transportation of passengers or property.
>
> A motor vehicle is used for commercial purposes if it is used for the carriage of persons or property directly or indirectly

---

**9.** Woods' testimony placed Starkey on the access road at the time of the ambush.

in connection with any business or other undertaking intended for profit.

Combining those terms, for you to find the defendant guilty of violating Title 18, United States Code, Section 33, the government must, among other things, prove beyond a reasonable doubt that the trucks involved in this case were used to transport passengers or property directly or indirectly in connection with a business or other undertaking intended for profit by Arch of West Virginia, Elite Security, and Deskins Contracting, or any of them.

Now, having defined motor vehicle for our purposes here, with respect to the offenses charged under Title 18, United States Code, Section 33, in addition to proving that the trucks are motor vehicles within the definition just provided, the government has the burden of proving that the trucks were used, operated, or employed in interstate commerce.

The term "interstate commerce" means commerce between or among the states. It is not necessary, however, that the trucks being driven by employees of Elite Security and Deskins Contracting actually be traveling across state lines or from one state to another at the time of the offense or offenses charged in order to find that they were used, operated, or employed in interstate commerce.

Rather, for purposes of Section 33, the interstate commerce requirement may be satisfied if the government has proved beyond a reasonable doubt that the trucks being driven by employees of Elite Security and Deskins Contracting were used or employed by Arch of West Virginia in connection with and in furtherance of its business of distributing coal mined in West Virginia to consumers in another state, or used or employed by Elite Security in connection with and in the course of conducting its business of providing security services outside the State of North Carolina.

(J.A. 1030–32).

■ Lowe argues that the district court's instructions "improperly focuse[d] on the interstate nature of the general business operations of Arch and Elite Security, without requiring that the *vehicles* themselves have some interstate nexus." Appellant's Brief at 19. This argument is easily disposed of. All the statute requires is that the vehicles be "used" in interstate commerce; in other words, as the district court stated, the vehicles must be used in connection with or in furtherance of the interstate market activities of the entities operating or employing the vehicles. Such was the case here. The vehicles were used in connection with and in furtherance of the interstate market activities of Arch and Elite.

■ Lowe also contends that the district court's instructions did not require the jury to find that the vehicles were being used in the transportation of passengers, passengers and property, or property and cargo. In his reply brief at 8, Lowe argues that "any suggestion that the government must prove that the vehicles were 'transporting either passengers or property' was negated by the instruction that 'the interstate commerce requirement may be satisfied if the government has proved ... that the trucks being driven by employees of Elite Security and Deskins Contracting were *used or employed by Arch of West Virginia in connection with and in furtherance of its business of distributing coal mined in West Virginia to consumers in another state, or used or employed by Elite Security in connection with and in the course of conducting its business of providing security services outside the State of North Carolina.*'"

Lowe's argument has no merit, as it confuses the motor vehicle component with the interstate commerce component of the statute. With respect to the definition of "motor vehicle," the district court's instructions were quite clear:

> [T]he definition of motor vehicle includes contrivances such as trucks which are used for commercial purposes on the highways in the transportation of passengers or property.

(J.A. 1030). Once the government established that the vehicles in question were motor vehicles, *e.g.*, that the vehicles transported passengers, the jury had to determine whether these vehicles were "used" in inter-

state commerce. Contrary to Lowe's protestations, § 33 requires no more than proof that the vehicles were used in furtherance of or in conjunction with the interstate activities of entities employing the vehicles.

■ Lowe's final contention is that the district court's jury instructions constructively amended the indictment in violation of *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Lowe argues that the district court's "jury instructions improperly permitted conviction on a theory never adopted by the grand jury: *i.e.,* that the vehicles were used in interstate commerce on July 22, 1993 because they were being 'used or employed *by Arch*' in connection with its interstate mining business." Appellant's Brief at 21.

This argument has no merit. The indictment alleged violations of 18 U.S.C. § 33 by incorporating through reference the following factual predicate:

(1) Arch was a corporation selling coal from the Ruffner Mine to various states in the United States;

(2) Arch employed both Deskins and Elite to provide services; and

(3) Deskins and Elite utilized motor vehicles.

(J.A. 13–15).

This factual predicate unquestionably served as an appropriate basis for the district court to instruct the jury that the interstate component of § 33 could be satisfied if the jury found that the vehicles "were used or employed by Arch of West Virginia in connection with and in furtherance of its business of distributing coal mined in West Virginia to consumers in another state." (J.A. 1031).

## V

Lowe also raises one other argument which he contends should be resolved in his favor. He contends that the district court

erred in its application of the Sentencing Guidelines. We have reviewed this assignment of error and find it to be without merit. For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED.*

MOTZ, Circuit Judge, dissenting:

An employee of a West Virginia company, driving a truck, without passengers or cargo, that was titled in West Virginia and owned by his West Virginia employer, was fatally shot as he was leaving a West Virginia coal mine to return to his employer's West Virginia shop. Principal responsibility for this tragedy was attributed to appellant Jerry Dale Lowe.[1] But Lowe was not charged with murder, manslaughter, felonious wounding, assault, battery, or any other seemingly appropriate state law offense. Instead, he was charged with, and convicted of, violating a federal statute aimed at punishing those who damage commercial vehicles used in interstate commerce. *See* 18 U.S.C. § 33. The majority concludes that the government proved, as it had to, that all vehicles involved in this case, including that driven by the victim, were (1) "used for commercial purposes ... in the transportation of passengers ... or property or cargo" and (2) "used, operated, or employed in interstate or foreign commerce." 18 U.S.C. §§ 31, 33. I do not believe that either of these elements was proved, and so I respectfully dissent.[2]

To come within the reach of § 33, damage must be done to a "motor vehicle," which is defined as a:

*carriage* or other contrivance propelled or drawn by mechanical power and *used for commercial purposes* on the highways *in the transportation of passengers, passengers and property, or property or cargo[.]*

18 U.S.C. § 31 (emphasis added).

The majority does not suggest that any of the vehicles involved in this case was used in the transportation of "property or cargo."

---

1. Seven other miners were permitted to plead guilty to a petty state offense, destruction of property, and were sentenced to 120 days in prison and fined $500.

2. I agree with the majority's well-reasoned conclusions as to the evidentiary and sentencing issues. I also agree that there was sufficient evidence presented at trial from which a jury could conclude that Lowe fired the shot that killed the decedent.

The majority does assert, however, that "each of the vehicles was used 'in the transportation of passengers.'" Maj. op. at 1143. I cannot find any evidence that any vehicle involved here was ever used for "*commercial* purposes" in the "transportation of passengers." The Elite vehicles were used to escort Deskins *vehicles* to and from the mine; although the Elite vehicles contained several Elite employees, there was no evidence that they were ever used to provide commercial transportation for Deskins employees or anyone else. The legislative history of § 33 strongly suggests that it was not intended to apply to vehicles in which employees of the vehicle owner were the only passengers, *i.e.,* that this does not constitute the "transportation of passengers" for "commercial purposes." *See* H.R.Conf.Rep. No. 2287, 84th Cong., 2d Sess. (1956), *reprinted in* 1956 U.S.C.C.A.N. 3145, 3151 (statute "*does not extend to motor vehicles,* including commercial motor vehicles, *used* merely for the transportation of property, or *for personal or private purposes*" (emphasis added)). Nor has any other court interpreted § 33 to apply to this or a similar situation; rather the statute has only been invoked in crimes involving vehicles engaged in true commercial, rather than private, purposes. *See, e.g., United States v. Lambert,* 994 F.2d 1088 (4th Cir.1993) (Greyhound bus); *United States v. Daniels,* 948 F.2d 1033 (6th Cir.1991) (same), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1279, 117 L.Ed.2d 504 (1992); *United States v. Heightland,* 865 F.2d 94 (6th Cir.) (truck transporting coal in first phase of interstate shipment), *cert. denied,* 493 U.S. 826, 110 S.Ct. 90, 107 L.Ed.2d 55 (1989).

However, even if § 33 was intended to apply to vehicles in which the owner's employees were the only passengers, it would not apply to the two Deskins vehicles. It was undisputed that the Deskins vehicles— including the one containing the victim who was fatally shot—contained only one person, the driver himself. At least with regard to the Deskins vehicles then, there cannot be any claim that any *passengers* were transported for any purpose, let alone for commercial purposes. By definition, drivers are not passengers. *See also* S.Rep. No. 225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3500 (discussing the need for amending the definition of "motor vehicle" to include "property or cargo" because without this addition, the statute "does not reach the destruction of" single-driver commercial trucks since they carry "only cargo, not passengers"). Absent evidence that the Deskins vehicles were ever used to transport "passengers," "property," or "cargo" as required by § 31, the convictions cannot stand.

Furthermore, to make out a violation of § 33, the "motor vehicles" that are damaged must also be "used, operated, or employed in interstate or foreign commerce." 18 U.S.C. § 33. The majority asserts that this requirement is satisfied because the vehicles were used to "further" the general business activities of Arch ("distribution of Arch's coal") and Elite ("Elite's business furnishing security services in the interstate market"). Maj. op. at 1143. No court has ever endorsed such a broad reading of § 33 and for good reason. The plain language of the statute clearly provides to the contrary.

First, only if a person damages a "motor vehicle which is used, operated, or employed in interstate ... commerce" is his conduct forbidden by § 33. Thus, the vehicles *themselves* must have some connection to interstate commerce. That the owners of the vehicles, Arch and Elite, were engaged generally in interstate activities is wholly irrelevant. *See United States v. Voss,* 787 F.2d 393, 395 (8th Cir.) (statute broader than § 33, which punishes anyone who *commits* arson on "property used in ... or ... affecting interstate or foreign commerce," held to require evidence "that the *building* [which was burned] was used in an activity affecting interstate commerce" rather than merely that the building owner was engaged in interstate commerce (emphasis added)), *cert. denied,* 479 U.S. 888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986).

Furthermore, § 33 requires that motor vehicles must be "used in" interstate commerce, not just "affect" interstate commerce. The Supreme Court has recognized three categories of statutes enacted by Congress

pursuant to its constitutional authority to regulate interstate commerce:

> The Commerce Clause reaches, in the main, three categories of problems. First, the use of channels of interstate or foreign commerce which Congress deems are being misused, as, for example, the shipment of stolen goods or of persons who have been kidnaped. Second, protection of the *instrumentalities of interstate commerce*, as, for example, the destruction of an aircraft, or persons or things in commerce, as, for example, thefts from interstate shipments. Third, those activities affecting commerce.

*Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971) (emphasis added) (citations omitted). As the Court has repeatedly emphasized, Congress is aware of the "distinction between legislation limited to activities *'in commerce*,' and an assertion of its full Commerce Clause power so as to cover all activity substantially *affecting interstate commerce*." *United States v. American Bldg. Maint. Indus.*, 422 U.S. 271, 280, 95 S.Ct. 2150, 2156, 45 L.Ed.2d 177 (1975) (emphasis added). Thus, the phrase "in commerce" is a more narrow and restrictive jurisdictional requirement than the phrase "affecting interstate commerce," and denotes "only persons or activities *within the flow of interstate commerce*—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Id.* at 276, 95 S.Ct. at 2154 (emphasis added) (quoting *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974)). Had Congress wanted to include in § 33 vehicles that are merely used to "further" or "affect" interstate commerce, it could easily have done so. It did not. *Compare* 18 U.S.C. § 844(i) (applying to vehicles "used in interstate or foreign commerce *or in any activity affecting interstate or foreign commerce*" (emphasis added)).

The jurisdictional phrase "used, operated, or employed in interstate or foreign commerce" appears in only two other sections of the Code. Section 32 of Title 18, enacted along with § 33 in 1956, provides for federal prosecution of anyone who "sets fire to, damages, destroys, disables, or wrecks ... any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce." 18 U.S.C. § 32. Sections 32 and 33 in turn adopted the language of 18 U.S.C. § 1992, which authorizes prosecution of anyone who "willfully derails, disables, or wrecks any train, engine, motor unit, or car used, operated, or employed in interstate or foreign commerce by any railroad." *See* H.R.Rep. No. 1979, 84th Cong., 2d Sess. (1956), *reprinted in* 1956 U.S.C.C.A.N. 3145. In both § 32 and § 1992, Congress was concerned with protecting certain channels and instrumentalities of interstate commerce, *e.g.*, trains and aircraft. Section 33 merely extended that protection to "motor vehicles ... used, operated, or employed in interstate or foreign commerce." *See, e.g., Lambert*, 994 F.2d 1088 (Greyhound bus); *Daniels*, 948 F.2d 1033 (same); *Heightland*, 865 F.2d 94 (truck transporting coal in first phase of interstate shipment); *see also* 1984 U.S.C.C.A.N. at 3500 ("there is a definite Federal interest in keeping open the channels of interstate commerce in which trucks play a critical role").

The vehicle that the decedent was driving was owned and operated by a West Virginia company in connection with an intrastate business transaction with another West Virginia company. There was no evidence that the vehicle had *ever* been used outside the state of West Virginia, in connection with interstate commerce or otherwise. The statute as interpreted by the majority would extend the reach of § 33 to every vehicle owned by a person or entity engaged in interstate commerce, no matter how confined the use of the vehicle, because conceivably every such vehicle somehow "furthers" the interstate market activities of its owner. I do not believe Congress intended to stretch the scope of § 33 in such a manner.

In light of the recent efforts towards "defederalization," it is surprising that the majority chooses to convert what would otherwise be a classic state-law offense, with strong local overtones, into a federal crime. In other contexts, the Supreme Court has warned against such statutory interpretation.

*See United States v. Bass,* 404 U.S. 336, 350, 92 S.Ct. 515, 524, 30 L.Ed.2d 488 (1971) ("[T]he broad construction urged by the Government renders traditionally local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources. Absent proof of some interstate commerce nexus in each case, [the statute] dramatically intrudes upon traditional state criminal jurisdiction." (citations omitted)). Nor does the fact that this tragedy occurred during a vitriolic labor strike somehow provide a basis for federal jurisdiction. The Supreme Court has also cautioned against this:

> [I]t would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes. Neither the language of [the statute] nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States.

*United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973).

For all of these reasons, I respectfully dissent.