**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 98-4472

RONALD LEE JOHNSON,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CR-98-7)

Submitted: February 16, 1999

Decided: March 1, 1999

Before MICHAEL and MOTZ, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Andrea C. Long, BOONE, BEALE, COSBY & LONG, Richmond,
Virginia, for Appellant. Helen F. Fahey, United States Attorney, John
S. Davis, Assistant United States Attorney, Richmond, Virginia, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A jury convicted Ronald Lee Johnson on separate counts of possession with intent to distribute crack cocaine and heroin in violation of 21 U.S.C. § 841(a) (1994). He was subsequently sentenced to 360 months' imprisonment. On appeal, Johnson alleges that the district court erred in denying his pre-trial motion to suppress evidence recovered as a result of an allegedly unconstitutional seizure. He further challenges the sufficiency of the evidence to support the jury's finding that he intended to distribute the crack cocaine and heroin seized from his person. Finding no error, we affirm.

The record discloses that on December 1, 1997, Richmond Police Detectives Ronald McClaren, Jr., and Deborah Allen were working off-duty at the Midlothian Village Apartments. Off-duty officers had recently made numerous arrests in the apartment complex, known to be a high crime area, for narcotics and trespassing violations. A "no trespassing" sign is posted on the front of each building and the complex's policy is that visitors must be accompanied by residents at all times. That evening, McClaren and Allen, in uniform, driving an unmarked car, observed other officers conducting a traffic stop and arrest nearby. They then noticed Johnson walking alone and slowly in the complex parking lot in the direction of the officers making the arrest. When Johnson observed the officers making the arrest, he noticeably changed his direction and quickened his pace.

Upon observing Johnson's behavior, McClaren and Allen pulled alongside Johnson and asked if they could talk to him. Johnson, in turn, asked, "Who are you?" McClaren identified himself as a police officer, at which point Johnson changed his direction and began to walk back again towards the apartment. The two officers parked and exited their vehicles to speak with Johnson. When McClaren again asked Johnson if they could speak with him, Johnson asked McClaren

2

what he wanted. After identifying himself, McClaren questioned Johnson as to whether he was a resident or a visitor. Becoming noticeably agitated, Johnson asked, "Why?" When McClaren referred to the "No Trespassing" signs and their commitment to enforcing the policy, Johnson stated that he was visiting someone. Again, Johnson grew increasingly agitated and began screaming that he had rights. McClaren continued his questioning, asking Johnson the name of the resident he was allegedly visiting. Johnson gave a woman's name which was not recognizable to either McClaren or Allen. When McClaren asked Johnson where this woman lived, Johnson replied, "I don't know, back there in the back, around the corner." Now irate and appearing nervous, Johnson claimed he did not know the woman's address. McClaren advised Johnson that he was under investigative detention and called for additional police assistance.

Upon request for identification, Johnson produced a Virginia driver's license which did not bear an address in the apartment complex. McClaren asked again the name of the woman he was visiting. This time Johnson gave what seemed to the officers to be a different woman's name. When Johnson was again unable to verify the woman's residence, McClaren advised Johnson that he was under arrest for trespassing. Because Johnson became very defensive and aggressive when McClaren attempted to handcuff Johnson, who continued to yell that he had rights, McClaren frisked him for weapons, finding none. McClaren advised Johnson of his Miranda rights and proceeded to take him to the rental office.

A search of Johnson incident to arrest revealed a brown paper bag consisting of a plastic baggie filled with chunks of crack cocaine and a blue wax paper pouch containing five individually wrapped hits of heroin. Subsequent tests revealed that the total amount of drugs was 9.217 grams of cocaine and .262 grams of heroin. McClaren also recovered fifty-five dollars cash from Johnson's wallet, and a pager. He did not find any other drug paraphernalia in Johnson's possession. After receiving his Miranda rights a second time, Johnson made several incriminating statements. He voluntarily identified the drugs in the bag as crack cocaine and heroin and upon questioning stated that each packet of heroin would sell for ten dollars. Although he first stated that the drugs were for personal use, he later stated that he did not use the "stuff." Johnson was then taken to the police station. The

officers observed no signs that Johnson personally used the drugs, such as burn marks or withdrawal. Johnson subsequently pleaded guilty in state court to trespassing.

Following federal indictment on separate counts for possession with intent to distribute crack cocaine and heroin, Johnson filed a pre-trial motion to suppress the evidence claiming that it was the result of an unconstitutional seizure. At the pre-trial hearing on the motion, Yolanda Carter testified that Johnson was visiting her at the Midlothian Village Apartments on December 1, 1997 and that her apartment was "around the back on the corner." The district court denied the motion. A jury ultimately convicted Johnson on both counts and he was sentenced to 360 months' imprisonment.

We first address whether Detectives McClaren and Allen conducted a legal Terry stop of Johnson. See Terry v. Ohio, 392 U.S. 1 (1968). The Fourth Amendment permits limited investigative stops by law enforcement officers when they are justified"by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980) (per curiam). Thus, an officer who stops and detains a person for investigative questioning "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21 (footnote deleted). While such a detention does not require probable cause, it does require something more than an "inchoate and unparticularized suspicion or `hunch.'" Id. at 27.

While we review de novo the ultimate question of reasonable suspicion, we review findings of historical fact only for clear error and "`give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" United States v. Sprinkle, 106 F.3d 613, 616-17 (4th Cir. 1997) (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)). We consider the "totality of the circumstances" surrounding the stop to assess its constitutionality. See United States v. Cortez, 449 U.S. 411, 417 (1981). "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular stopped of criminal activity." Id. at 417-18.

4

In light of these principles, we believe that the facts set forth above, when taken as a whole, justified the initial stop of Johnson. Given the high crime nature of the apartment complex, Johnson's behavior, and his apparent violation of the complex's policies, the police had reasonable articulable suspicion that Johnson was guilty of trespassing. Because the police conducted a legitimate <u>Terry</u> stop, the investigative detention did not constitute an unconstitutional seizure. Johnson's continued evasive conduct and agitated behavior upon questioning during the investigative detention then gave rise to probable cause to arrest. The drugs recovered from his person were thus admissible because they were obtained pursuant to the valid search incident to arrest. Furthermore, the validity of the arrest precludes any challenge to the admission into evidence of his incriminating statements.

We next address Johnson's challenge to the sufficiency of the evidence supporting the jury's finding that he possessed the crack cocaine and heroin with the intent to distribute the substances. The jury's verdict "must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." <u>Glasser v. United States</u>, 315 U.S. 60, 80 (1942). Thus, we may reverse a jury verdict only if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt. <u>See United States v. Lowe</u>, 65 F.3d 1137, 1142 (4th Cir. 1995).

In this case, there was sufficient evidence from which the jury could find beyond a reasonable doubt that Johnson knowingly possessed the crack cocaine and heroin with intent to distribute them. At trial, Detective Mark Dunn testified as an expert that drug distributors use pagers to facilitate distribution and paper bags for packaging drugs. Police recovered 9.2 grams of crack cocaine from Johnson's person. Dunn testified that the typical crack user ingests approximately 1/10 of a gram per "hit." <u>See United States v. LaMarr</u>, 75 F.3d 964, 973 (4th Cir. 1996) (finding 5.72 grams of crack consistent with distribution). He further stated that it was customary for distributors to carry a large chunk of the drug, and cut off pieces for individual buyers. Johnson carried the equivalent of ninety hits. Additionally, Dunn maintained that crack users usually smoke as much as they have and they typically have burned and scarred fingers or burned lips.

Regarding the heroin, Dunn stated that Johnson possessed the equivalent of five individual hits of heroin. Although the quantity of

5

heroin was relatively small, Dunn testified that it would be unusual for a user to possess that much heroin at one time. Furthermore, the heroin was packaged into smaller packages, containing individual dosages, for ready distribution.

Moreover, there is little evidence that Johnson actually used the drugs. The officers noticed no such indication in his physical condition. They also recovered no drug paraphernalia on his person suggestive of personal use. Last, the woman he visited in the apartment complex testified that she had never witnessed Johnson using drugs. This statement is buttressed by Johnson's own admission to the police after arrest that he did not use that "stuff." We therefore find sufficient evidence from which the jury could have inferred Johnson's intent to distribute cocaine base and heroin.

Accordingly, we affirm Johnson's conviction and sentence. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED